**SAC ATTORNEYS LLP**
James Cai (CA SBN 200189)
Brian A. Barnhorst (CA SBN 130292)
Woody Wu (CA SBN 309317)
1754 Technology Drive, Suite 122
San Jose, California 95110
Telephone: (408) 436-0789

James L. Williams (#026402)
Esther L. Sivak (#034715)
**SCHMITT SCHNECK**
**EVEN & WILLIAMS, P.C.**
1221 East Osborn Road, Suite 105
Phoenix, AZ 85014-5540
Telephone: (602) 277-7000
Facsimile:  (602) 277-8663
james@azbarristers.com
esther@azbarristers.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA—PHOENIX

| | |
|---|---|
| **Le Garden HB, LLC**, a California limited liability company; **Brent Wei-Teh Lee**, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> **Amazing Hospitality Group, LLC**, an Oregon limited liability company; **Arizona Garden Hotel, LLC**, an Oregon limited liability company; **Jeffrey Alan Fleming**, an individual; **Thomas Title and Escrow Company**, an **Arizona corporation**; and **Does 1-10**, inclusive, <br><br> Defendants. | Case Number: <br><br> **Complaint** |

COME NOW the Plaintiffs and complain as follows:

**THE PARTIES**

1.      Plaintiff LE GARDEN HB, LLC ("LE GARDEN"), is and, at all times relevant hereto, was a California limited liability company in good standing, with its principal place of business at 10430 S. De Anza Blvd., Suite 280, Cupertino, CA 95014.

2.      Plaintiff BRENT WEI-TEH LEE is the president, CEO, and sole managing member of LE GARDEN, and is a resident of the State of California.

3.      Plaintiffs are informed and believe and, based thereon, allege that Defendant AMAZING HOSPITALITY GROUP, LLC ("AMAZING"), is an Oregon limited liability company with its principal place of business at 1884 Zachris Court NE, Keizer, OR 97303.  Plaintiffs are further informed and believe, and, based thereon, allege that AMAZING was founded on or about February 25, 2009, and that, although administratively suspended on at least three (3) occasions (2013 for ~14 months, 2016 for ~1 month, and 2018 for ~22 months), AMAZING is and, at all times relevant hereto, was in good standing with the Oregon Secretary of State.

4.      Plaintiffs are informed and believe and, based thereon, allege that Defendant ARIZONA GARDEN HOTEL, LLC ("AGH"), is an Oregon limited liability company with its principal place of business at 1884 Zachris Court NE, Keizer, OR 97303.  Plaintiffs are further informed and believe, and, based thereon, allege that AGH was founded on or about March 25, 2020, and that, at all times relevant hereto, was in good standing with the Oregon Secretary of State.[1]

5.      Plaintiffs are informed and believe and, based thereon, allege that Defendant JEFFREY ALAN FLEMING is a resident of the State of Oregon, and is the managing member of Defendants AMAZING and AGH.

6.      Plaintiffs are informed and believe and, based thereon, allege that Defendant THOMAS TITLE AND ESCROW COMPANY ("THOMAS TITLE") is an Arizona corporation in good standing with the Arizona Corporation Commission.

---

[1] As detailed below, AGH was formed the very day that LEE entered into the Purchase and Sale Agreement with Defendants.

7.     The true names and capacities of defendants sued as DOES 1-10, inclusive, are presently unknown to Plaintiffs, who therefore sue said defendants by such fictitious names; Plaintiffs will amend this Complaint to show their true names and capacities when the same have been ascertained.

### JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332—the amount in controversy exceeds $75,000, and all plaintiffs are of different citizenship than all defendants.

9.     Venue is appropriate in this Court because the real property at issue is located in Phoenix.

### ALLEGATIONS COMMON TO ALL CLAIMS

10.     On or about March 25, 2020, LEE and AGH entered into an agreement entitled "Agreement of Purchase and Sale" (the "Agreement"; a true copy is attached as Exhibit "A" hereto) by the terms of which LEE would acquire from AGH, for $4.9 million, a hotel in Phoenix, Arizona.[2]  FLEMING signed the Agreement on behalf of AGH as its Manager; LEE signed individually.

11.     Escrow was established with Defendant THOMAS TITLE, and the closing date was stated to be no later than 54 days after "full execution of the Agreement."  (Agreement at section 2.3(a).)  Because the signatures are not separately dated, the operative date was also the effective date of the Agreement (3/25/20); and, as a result, the closing date would have been on or about May 18, 2020.

12.     LEE deposited $200,000 into escrow as called for in the Agreement, which further provided that LEE had the right to terminate the Agreement and receive a return of his deposit at any time prior to midnight on April 18, 2020.[3]  Through a pair of amendments (dated 4/16

---

[2] Unless the context requires otherwise, the Real Property, the Related Assets, and the Ground Lease are collectively referred to herein as the "Subject Property".

[3] These provisions are found in subsection (a)(i) of Section 2.2 of the Agreement. Plaintiffs are informed and believe, and, based thereon, allege that there are apparently two different versions of the Agreement with two different versions of this subsection (a)(i). THOMAS TITLE

and 4/20), this date was extended to April 21, and the price was reduced to $4.4 million. (Ultimately, LEE formally terminated the Agreement on May 4, 2020.)

13.     The Agreement recites that AGH "is the owner of the ground lease, building, parking garage, and other improvements constituting the 'Property' commonly known as the 'Wyndham Garden Midtown Phoenix' . . . ."[4] (Agreement at p.1 (Background, part A).) **This statement was patently false.**

14.     In fact, on or about March 23, 2020, AMAZING (not AGH) had entered into an agreement to acquire the Subject Property out of bankruptcy for $2.9 million, but was not guaranteed even to be the purchaser.  (In an opposition filed by Wyndham Franchisor LLC (Doc #222) in case number 2:19-bk-14399-PS before the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Case")), it was explained that "AGH is the proposed stalking horse purchaser under the Agreement for Purchase and Sale . . . .  The Motions are subject to higher and better offers and further would allow a designee of the Stalking Horse to purchase of the Hotel and potentially take assignment of the Franchise Agreement.")[5]

---

previously produced to Plaintiffs a version that has additional language tacked on at the end of subsection (a)(i): "Once Buyer has deposited in full the $200,000.00 Earnest Money Deposit into this assigned escrow account, Buyer is fully aware that the full amount deposited will be transferred to escrow 4339TAZ and this shall close only with the successful close of 4339TAZ. Thompson [sic] Title holds no liability and is not responsible in any way for the return of this deposit to Buyer should the close of the sale not take place. It is the sole responsibility of the Seller for the refund of the deposit to the Buyer." **This language was not in the Agreement that LEE signed.**

[4] Seller made several additional representations and warranties (Article III of the Agreement), including: "Seller has all requisite power and authority to enter into this Agreement and the Closing Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby." (Section 3.1(b).)

[5] "A stalking horse offer, agreement, or bid is a bid for a bankrupt firm or its assets that is arranged in advance of an auction to act as an effective reserve bid. The intent is to maximize the value of its assets or avoid low bids, as part of (or before) a court auction. To secure a stalking horse offer, the debtor can offer bidding protections such as breakup fees to its best bidder before the auction. These incentives enhance the value of the offering for the bidder, which might lead to a better price offer before the auction begins. This higher offer is now the

15.     The day after entering into this agreement, the debtor filed a motion in the Bankruptcy Case to approve the sale to AMAZING "or such higher and better offer as may occur at the scheduled sale hearing . . . ."  In that motion, the debtor, Hotel Oxygen Midtown I, LLC ("HOMS"), stated that the parties "desire to close the sale transaction on a date that forty-five (45) days after the Purchase Contract is fully executed or twenty (20) days after the approval of the sale by this Court whichever date is later . . . ."[6]  Thus, the anticipated closing date was, at the earliest, May 7th.

16.     Attached to the motion was a copy of the agreement between HOMS and AMAZING. A comparison of that agreement with the Agreement between Plaintiff LEE and Defendant AGH reveals that the two are essentially identical—including the recitation (true in the former but false in the latter) that the "seller" was the owner of the Subject Property.

17.     The hearing was continued to May 8, 2020, and then to May 20, 2020.

18.     On 5/20, Debtor filed a Notice of Filing of Amendment to Sale Contract, advising the court that Fleming had come to Debtor on 5/12 asking for an extension.  Debtor consented, subject to the following conditions:

- The closing date of the sale, originally scheduled for May 18, 2020, was extended to June 1, 2020, and potentially to June 22, 2020.
- Of the $200,000 earnest money—notably, Plaintiffs' money, not Fleming's—$64,934.46 was to be immediately released to the landlord (Talisker Second Osborn, LLC ("Talisker")) for the payment of June 2020 rent.
- Fleming was to provide an additional deposit of $200,000 non-refundable earnest money by June 1, 2020.

/ / / / /

---

starting offer for the auction and may result in benefiting the debtor and its estate."
https://en.wikipedia.org/wiki/Stalking_horse_offer.
[6] The agreement itself called for the transaction to close "on the date which is fifty five (55) days after full execution of this Agreement or within 20 days of the approval of the sale by the bankruptcy court, whichever date is later . . . ."

19.     On July 2, 2020, FLEMING and LEE (who still did not know that FLEMING was not the owner of the Subject Property) sought to revive the transaction by entering into a written agreement entitled "Reinstatement and Third Amendment to Agreement of Purchase and Sale" (the "Reinstatement"); AGH was still the seller, and LE GARDEN (LEE's assignee) was the purchaser.  A true copy of the Reinstatement is attached as Exhibit "B" hereto.[7]

20.     The Reinstatement recited: "Effective upon the full execution of this Amendment by Seller, Buyer and Escrow Agent, the Agreement is reinstated and is in full force and effect and binding upon Seller and Buyer, subject only to the amendments and modifications set forth in this Amendment."  Defendants thereby republished the misrepresentation in the Agreement as to ownership of the Subject Property.

21.     The Reinstatement called for another $200,000 deposit, which LE GARDEN made; it reduced the purchase price to $2.9 million; and it called for closing on or before July 16, 2020. The Reinstatement recited that the subject of the transaction was "Seller's interest in a ground lease dated April 2, 2007, as amended and assigned ('Ground Lease'), for the Property located at 3600 N. 2nd Avenue, Phoenix, Arizona and the building and improvements thereon (collectively the 'Assets' as defined in the Contract [i.e., the Agreement of Purchase and Sale dated 3/25/20]) pursuant to which Thomas Title and Escrow Agency ('Escrow Agent'), Escrow No. 5559TAZ ('Escrow') was established."  Again, ***this recital was patently false***—Seller's interest in the Subject Property was non-existent.

22.     LEE subsequently learned that Hotel Oxygen Midtown I LLC owned the Property and was party to the ground lease with Talisker Second Osborn LLC; the parties with whom LEE and LE GARDEN had contracted—FLEMING and AGH—didn't own ***anything***.

---

[7] The cover page of a Ground Lease Agreement dated 4/2/07 was attached to the Reinstatement along with a document entitled Ground Lease Abstract—Summary of Basic Terms; however, the parties to it were Gibralter Sunshine GL, LLC (Landlord) and Gibralter Sunshine S, LLC and Gibralter Sunshine H, LLC (collectively, Tenant). No amendment or assignment of that lease was attached thereto. Plaintiffs are informed and believe, and, based thereon, allege that no such amendment or assignment for the benefit of FLEMING, AMAZING, or AGH ever existed.

23.     Plaintiffs are informed and believe, and, based thereon, allege that THOMAS TITLE was aware of all this—it knew that the Subject Property was under the jurisdiction of the bankruptcy court (THOMAS TITLE is explicitly referenced in the court's order) and was the subject of multiple hearings regarding its sale; THOMAS TITLE also knew that FLEMING, AMAZING, and AGH did not own what they had contracted to sell, and that their representation to the contrary in the Agreement (later reiterated in the Reinstatement) was false. In breach of its duties to Plaintiffs, THOMAS TITLE failed to disclose to Plaintiffs any of this information.

24.     Debtor had originally sought approval of the sale of the Subject Property on July 16, 2020, to AMAZING (erroneously referred to in the Order as "American Hospitality Group, LLC");[8] however, the court had been advised that AMAZING was not yet ready to close, and the hearing was therefore continued to July 28, 2020.

25.     At that hearing on the 28th, AMAZING was still not ready to close, and counsel for the debtors advised the court that LE GARDEN was being substituted as the purchaser in place of AMAZING.  Escrow closed on or about August 31, 2020.  A copy of the closing statement is attached as Exhibit "C" hereto.

26.     As is clear from this recital, neither Defendant FLEMING nor either of his entities—Defendants AMAZING and AGH—had ever owned, and did not purchase, the Subject Property or any part of it.

27.     The Agreement contained no recital or disclosure even alluding to the fact that AGH did not own the Subject Property, and FLEMING did not disclose this to LEE.[9]

---

[8] Because the closing under the Agreement between LEE and AGH was set for May 18, 2020, and AGH was not scheduled to acquire the Subject Property (presumably after it was transferred from AMAZING) until at least two months later, AGH obviously had no ability to perform under the Agreement with LEE.

[9] In various filings in the Bankruptcy Case, debtor and others (e.g., Talisker and creditors) told the bankruptcy court that they had had no idea until shortly before the closing that Fleming was planning to flip the Subject Property to Plaintiffs.

28.     On May 20, 2020, and June 5, 2020—without the knowledge or approval of LEE—THOMAS TITLE unilaterally disbursed LEE's $200,000 earnest money deposit ("EMD") for the apparent benefit of FLEMING: $64,934.46 to Talisker Second Osborn, LLC (as noted above); and $135,065.54 to Estate of Hotel Oxygen Midtown.

29.     THOMAS TITLE subsequently explained that the $200,000 had been "released to the 1st leg seller (Hotel Oxygen at their request and with the approval of [AMAZING] the rightful owner of the EMD) to pay rent and remainder to the estate of the 1st leg sellers)."  Plaintiffs are informed and believe, and, based thereon, allege that, as evidenced by the reference to Hotel Oxygen as the "1st leg seller", THOMAS TITLE understood FLEMING intended to acquire the Subject Property and then sell it to LEE.  ***THOMAS TITLE never advised Plaintiffs that FLEMING was not the owner of the Subject Property.***

30.     The conclusion that AMAZING was "the rightful owner of the EMD" was clearly erroneous—LEE's agreement was with AGH, not AMAZING, and AGH was in breach of the Agreement by, *inter alia*, having no right or title to convey to LEE.

31.     As described above, LE GARDEN ultimately acquired the Subject Property out of bankruptcy when FLEMING could not do so.  Escrow closed on or about August 31, 2020. The purchaser was LE GARDEN, and the seller was Hotel Oxygen Midtown I, LLC (as debtor in possession).  However, because the transaction between LE GARDEN and AGH as contemplated by the Reinstatement had failed to close by July 16, 2020, THOMAS TITLE unilaterally determined that LE GARDEN was in breach of the agreement, and, on September 4, 2020, disbursed the second $200,000 earnest money deposit to AMAZING.  THOMAS TITLE asserted that "buyer did not perform under the terms and conditions agreed to" in the Reinstatement because "the closing did not take place" by July 16, 2020, as called for in the Reinstatement.  In fact, of course, the opposite is true—seller did not perform, because it did not own what it purported to sell.

/ / / / /

/ / / / /

## COUNT ONE

### Fraud

(Against Defendants FLEMING, AMAZING, and AGH)

32.     Plaintiffs incorporate by this reference the allegations of the foregoing paragraphs 1-31 as if set forth in full herein.

33.     As alleged herein, FLEMING—individually and on behalf of AMAZING and AGH—repeatedly represented to Plaintiffs that he and his entities were the owners of the Subject Property.

34.     The seller's ownership, *vel non*, was a material fact with regard to Plaintiffs' decision to purchase the Subject Property.

35.     Said misrepresentation was false, and said Defendants knew it to be false at the times made as alleged herein.

36.     Said Defendants made said misrepresentation for the purpose of inducing Plaintiffs, as alleged herein, to rely thereon by entering into the Agreement and the Reinstatement, and by twice making earnest money deposits of $200,000 into escrow.

37.     At the time made, Plaintiffs did not know, and had no reason to suspect, that Defendants' misrepresentation was false.

38.     Plaintiffs reasonably relied on Defendants' misrepresentation by entering into the Agreement and the Reinstatement, and by twice making earnest money deposits of $200,000 into escrow.

39.     As a direct and proximate result of Plaintiffs' reliance on Defendants' misrepresentation, Plaintiffs have been damaged in an amount to be proven at trial but believed to be at least $400,000, together with interest as allowed by law.

40.     Defendants' actions were guided by an evil mind. Defendants were deliberately dishonest and pursued their own financial gain by improper means. Punitive damages are warranted in order to punish Defendants for such conduct and to deter such conduct in the future.

41.     As a direct and proximate result of AGH's conduct as herein alleged, Plaintiffs are entitled to rescission of the Agreement and the Reinstatement and to a return of their earnest money deposits of $400,000, together with interest as allowed by law.

WHEREFORE, on COUNT ONE, Plaintiffs pray for judgment against Defendants FLEMING, AMAZING, and AGH as follows:

A.     For compensatory damages in an amount to be proven at trial, but believed to be no less than $400,000, together with interest as allowed by law;

B.     For rescission of the Agreement and the Reinstatement, and for restitution of Plaintiffs' $400,000 in earnest money deposits;

C.     For Plaintiffs' costs incurred herein and accruing, pursuant to A.R.S. § 12-341;

D.     For Plaintiffs' attorneys' fees incurred herein and accruing, pursuant to the A.R.S. § 12-341.01, including Plaintiffs' reasonable attorneys' fees incurred throughout the collection and/or judgment enforcement process;

E.     For post-judgment interest at the legal rate on all costs and attorneys' fees from the date of judgment until paid in full;

F.     For punitive damages in an amount sufficient to punish Defendants and to deter the conduct complained of herein;

G.     Plaintiffs also request that this Court retain jurisdiction over this case so that, if Plaintiffs incur attorneys' fees and costs during the collection process over and above that originally awarded by the Court, Plaintiffs will have the ability to move the Court to obtain additional relief to which Plaintiffs are entitled; and

H.     For such other and further relief as the Court might deem just and appropriate.

/ / / / /

/ / / /

## COUNT TWO

### Breach of Contract

#### (Against Defendant AGH)

42.     Plaintiffs incorporate by this reference the allegations of the foregoing paragraphs 1-31 as if set forth in full herein.

43.     Subject to the fraud as herein alleged and in the alternative thereto, the Agreement was a valid and enforceable contract between LEE and AGH, and the Reinstatement was a valid and enforceable contract between LE GARDEN and AGH.

44.     Because AGH did not hold title to the Subject Property at the time it entered into the Agreement with LEE, AGH was in breach of the Agreement *ab initio*; because AGH did not hold title to the Subject Property at the time it entered into the Reinstatement with LE GARDEN, AGH was in breach of the Reinstatement *ab initio*.

45.     In Article III of the Agreement (entitled "Representations, Warranties and Certain Covenants of Seller"), Seller represented and warranted in part as follows:

- "Seller has all requisite power and authority to enter into this Agreement and the Closing Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby." (Section 3.1(b).)

- "The execution, delivery and performance of this Agreement and the Closing Documents to which Seller is a party and the consummation of the transactions provided for in this Agreement and the Closing Documents to which Seller is a party have been duly authorized by all necessary action on its part." (Section 3.1(b).)

- "No consent or approval of any Governmental Authority is required to be obtained or made in connection with Seller's execution, delivery and performance of this Agreement, the Closing Documents to which Seller is a party or any of the transactions required or contemplated hereby or thereby . . . ." (Section 3.1(c).)

- "To Seller's Knowledge, Seller has good title to the Personal Property (other than the Excluded Personal Property) and the same is (or will be at Closing) free and clear of all Liens, charges and encumbrances, other than the rights of any vendors or suppliers under Contracts and any Permitted Exceptions." (Section 3.2(e).)[10]

46.   Each of these representations and warranties was untrue.

- Seller did not have the power or the authority to enter into the Agreement or the Closing Documents, did not have the power or the authority to perform its obligations under the Agreement, and did not have the power or the authority to consummate the transactions contemplated thereby.

- The execution and performance of the Agreement, and the consummation of the transaction, had not been duly authorized by all necessary action by Seller, because it had not acquired any interest in the Subject Property.

- The consent and approval of a Governmental Authority—*viz.*, the Bankruptcy Court—was required to be obtained before Seller could acquire the Subject Property, which was a necessary precondition to Seller's execution and performance of the Agreement and the Closing Documents.

- Seller did not have good title (or any title) to the personal property that was part of the Subject Property.

---

[10] Other warranties implied facts that were untrue—e.g., Seller warranted that "there have been no material changes to the Assets or the operations of Seller's business utilizing the Assets in the period between August 20, 2018 and the Effective Date." (Section 3.2(f).) In fact, Seller had no business that utilized the Assets, because Seller did not own the Subject Property. See also section 3.4(b) ("Seller shall keep the Property insured against fire and other hazards covered by the insurance policies maintained . . . by Seller on the Effective Date") and section 3.4(c) ("Seller shall operate and maintain the Property in the ordinary course of business and generally consistent with Seller's past practices with respect to the Property"). In fact, Seller maintained no insurance on the Subject Property (because it had no insurable interest in it), and did not operate or maintain the Subject Property (because it held no interest in it).

47.     Each of these warranties, because false, constituted a breach of the Agreement and of the Reinstatement by AGH.

48.     Plaintiffs performed all acts required of them by the Agreement and the Reinstatement except to the extent prevented from performing by AGH.

49.      As a direct and proximate result of AGH's breaches, Plaintiffs have been damaged in an amount to be proven at trial but believed to be at least $400,000, together with interest as allowed by law.

50.     As a direct and proximate result of AGH's breaches, Plaintiffs are entitled to rescission of the Agreement and the Reinstatement, and to restitution of the $400,000 in earnest money deposits.

WHEREFORE, on COUNT TWO, Plaintiffs pray for judgment against Defendant AGH as follows:

A.     For compensatory damages in an amount to be proven at trial, but believed to be no less than $400,000, together with interest as allowed by law;

B.     For rescission of the Agreement and the Reinstatement, and for restitution of Plaintiffs' $400,000 in earnest money deposits;

C.     For Plaintiffs' costs incurred herein and accruing, pursuant to A.R.S. § 12-341;

D.     For Plaintiffs' attorneys' fees incurred herein and accruing, pursuant to the A.R.S. § 12-341.01, including Plaintiffs' reasonable attorneys' fees incurred throughout the collection and/or judgment enforcement process;

E.     For post-judgment interest at the legal rate on all costs and attorneys' fees from the date of judgment until paid in full;

F.     Plaintiffs also request that this Court retain jurisdiction over this case so that, if Plaintiffs incur attorneys' fees and costs during the collection process over and above that originally awarded by the Court, Plaintiffs

will have the ability to move the Court to obtain additional relief to which Plaintiffs are entitled; and

G.    For such other and further relief as the Court might deem just and appropriate.

## COUNT THREE

### Breach of Contract

(Against Defendant THOMAS TITLE)

51.    Plaintiffs incorporate by this reference the allegations of the foregoing paragraphs 1-31 as if set forth in full herein.

52.    The escrow instructions between and among Plaintiffs, AGH, and THOMAS TITLE constituted a valid and enforceable agreement.

53.    By engaging in the conduct complained of herein—*viz.*, twice releasing Plaintiffs' $200,000 earnest money deposits—Defendant THOMAS TITLE breached its obligations to Plaintiffs under the escrow instructions.

54.    Plaintiffs performed all acts required of them by the escrow instructions except to the extent prevented from performing by AGH and/or THOMAS TITLE.

55.    As a direct and proximate result of AGH's breaches, Plaintiffs have been damaged in an amount to be proven at trial but believed to be at least $400,000, together with interest as allowed by law.

WHEREFORE, on COUNT THREE, Plaintiffs pray for judgment against Defendant THOMAS TITLE as follows:

A.    For compensatory damages in an amount to be proven at trial, but believed to be no less than $400,000, together with interest as allowed by law;

B.    For Plaintiffs' costs incurred herein and accruing, pursuant to A.R.S. § 12-341;

C.      For Plaintiffs' attorneys' fees incurred herein and accruing, pursuant to the A.R.S. § 12-341.01, including Plaintiffs' reasonable attorneys' fees incurred throughout the collection and/or judgment enforcement process;

D.      For post-judgment interest at the legal rate on all costs and attorneys' fees from the date of judgment until paid in full;

E.      Plaintiffs also request that this Court retain jurisdiction over this case so that, if Plaintiffs incur attorneys' fees and costs during the collection process over and above that originally awarded by the Court, Plaintiffs will have the ability to move the Court to obtain additional relief to which Plaintiffs are entitled; and

F.      For such other and further relief as the Court might deem just and appropriate.

## COUNT FOUR

### Breach of Fiduciary Duty

(Against Defendant THOMAS TITLE)

56.    Plaintiffs incorporate by this reference the allegations of the foregoing paragraphs 1-31 as if set forth in full herein.

57.    As escrow holder, THOMAS TITLE owed to Plaintiffs a fiduciary duty.

58.    Specifically, THOMAS TITLE had a fiduciary duty (1) to comply strictly with the terms of the agreement, and (2) to disclose facts that a reasonable escrow agent would perceive as evidence of a fraud being committed against Plaintiffs.

59.    By engaging in the acts complained of herein, THOMAS TITLE breached its fiduciary duty to Plaintiffs.

60.    As a direct and proximate result of THOMAS TITLE's breach of its fiduciary duty to Plaintiffs, Plaintiffs have been damaged in an amount to be proven at trial but believed to be at least $400,000, together with interest as allowed by law.

61.     Defendant Thomas Title's actions were guided by an evil mind. Defendant Thomas Title was deliberately dishonest and pursued its own financial gain by improper means. Punitive damages are warranted in order to punish Defendant Thomas Title for such conduct and to deter such conduct in the future.

WHEREFORE, on COUNT FOUR, Plaintiffs pray for judgment against Defendant THOMAS TITLE as follows:

A.     For compensatory damages in an amount to be proven at trial, but believed to be no less than $400,000, together with interest as allowed by law;

B.     For Plaintiffs' costs incurred herein and accruing, pursuant to A.R.S. § 12-341;

C.     For Plaintiffs' attorneys' fees incurred herein and accruing, pursuant to the A.R.S. § 12-341.01, including Plaintiffs' reasonable attorneys' fees incurred throughout the collection and/or judgment enforcement process;

D.     For post-judgment interest at the legal rate on all costs and attorneys' fees from the date of judgment until paid in full;

E.     For punitive damages in an amount sufficient to punish Defendant and to deter the conduct complained of herein;

F.     Plaintiffs also request that this Court retain jurisdiction over this case so that, if Plaintiffs incur attorneys' fees and costs during the collection process over and above that originally awarded by the Court, Plaintiffs will have the ability to move the Court to obtain additional relief to which Plaintiffs are entitled; and

G.     For such other and further relief as the Court might deem just and appropriate.

/ / / / /
/ / / / /

### COUNT FIVE

### Negligence

### (Against Defendant THOMAS TITLE)

62.     Plaintiffs incorporate by this reference the allegations of the foregoing paragraphs 1-31 as if set forth in full herein.

63.     As alleged herein, Plaintiffs contend that they had a contractual relationship with THOMAS TITLE; to the extent that THOMAS TITLE asserts no such contractual relationship existed, THOMAS TITLE nonetheless owed to Plaintiffs a duty to use due care in the performance of its functions as escrow officer inasmuch as it was foreseeable that, if it failed to do so, Plaintiffs would be harmed as a result.

64.     By engaging in the acts complained of herein, THOMAS TITLE breached its duty to Plaintiffs to use due care in the performance of its functions as escrow officer.

65.     As a direct and proximate result of THOMAS TITLE having engaged in the acts complained of herein, Plaintiffs have been damaged in an amount to be proven at trial but believed to be at least $400,000, together with interest as allowed by law.

WHEREFORE, on COUNT FIVE, Plaintiffs pray for judgment against Defendant THOMAS TITLE as follows:

A.     For compensatory damages in an amount to be proven at trial, but believed to be no less than $400,000, together with interest as allowed by law;

B.     For Plaintiffs' costs incurred herein and accruing, pursuant to A.R.S. § 12-341;

C.     For Plaintiffs' attorneys' fees incurred herein and accruing, pursuant to the A.R.S. § 12-341.01, including Plaintiffs' reasonable attorneys' fees incurred throughout the collection and/or judgment enforcement process;

D.     For post-judgment interest at the legal rate on all costs and attorneys' fees from the date of judgment until paid in full;

E.    Plaintiffs also request that this Court retain jurisdiction over this case so that, if Plaintiffs incur attorneys' fees and costs during the collection process over and above that originally awarded by the Court, Plaintiffs will have the ability to move the Court to obtain additional relief to which Plaintiffs are entitled; and

F.    For such other and further relief as the Court might deem just and appropriate.

## COUNT SIX

### Conversion

(Against All Defendants)

66.    Plaintiffs incorporate by this reference the allegations of the foregoing paragraphs 1-31 as if set forth in full herein.

67.    By knowingly and intentionally engaging in the conduct complained of herein—*viz.*, THOMAS TITLE disbursed the two $200,000 earnest money deposits without Plaintiffs' knowledge or consent, and Defendants FLEMING, AMAZING, and AGH accepted the benefits of those distributions—said Defendants converted Plaintiffs' $400,000.

68.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial but believed to be at least $400,000, together with interest as allowed by law.

69.    Defendants' actions were guided by an evil mind.  Defendants were deliberately dishonest and pursued their own financial gain by improper means.  Punitive damages are warranted in order to punish Defendants for such conduct and to deter such conduct in the future.

WHEREFORE, on COUNT SIX, Plaintiffs pray for judgment against Defendants as follows:

A.   For compensatory damages in an amount to be proven at trial, but believed to be no less than $400,000, together with interest as allowed by law;

B.   For Plaintiffs' costs incurred herein and accruing, pursuant to A.R.S. § 12-341;

C.   For Plaintiffs' attorneys' fees incurred herein and accruing, pursuant to the A.R.S. § 12-341.01, including Plaintiffs' reasonable attorneys' fees incurred throughout the collection and/or judgment enforcement process;

D.   For post-judgment interest at the legal rate on all costs and attorneys' fees from the date of judgment until paid in full;

E.   For punitive damages in an amount sufficient to punish Defendant and to deter the conduct complained of herein;

F.   Plaintiffs also request that this Court retain jurisdiction over this case so that, if Plaintiffs incur attorneys' fees and costs during the collection process over and above that originally awarded by the Court, Plaintiffs will have the ability to move the Court to obtain additional relief to which Plaintiffs are entitled; and

G.   For such other and further relief as the Court might deem just and appropriate.


DATED this 20th day of May, 2021.

                              **SAC ATTORNEYS LLP**

                                   James Cai, Esq.
                                   Brian A. Barnhorst, Esq.
                                   Woody Wu, Esq.

                              **SCHMITT SCHNECK**
                              **EVEN & WILLIAMS, P.C.**

                                   /s/ James L. Williams

James L. Williams
Esther L. Sivak
1221 East Osborn Road, Suite 105
Phoenix, Arizona 85014-5540
*Counsel for Plaintiff*